## Bitner *versus* Bitner.

1. In a feigned issue on a will the pleadings should present a distinct question of fact; "whether the writing is the will of the decedent?" is too loose.

2. In an issue directed by the register, the Common Pleas has jurisdiction to try issues of fact only.

3. On a question of mental capacity, evidence that the decedent who had been mild, amiable and modest, had become irritable, harsh, suspicious and obscene is proper, although on some subjects he may have been sound.

4. The opinion of a physician who had had frequent conversations and intercourse with the decedent for a long time is admissible on the question of sanity, although witness was not the attending physician.

5. A will which outrages common feeling and shows want of ordinary natural affection is to be considered in connection with other evidence on the question of sanity.

6. Intelligent knowledge by a testator that his will would disinherit some of his children, is not inconsistent with a delusion in regard to them which led to their exclusion.

7. Strong expressions of opinion by a judge to the jury may be tolerated and are sometimes necessary.

8. The Supreme Court will not reverse where the case is left fully and fairly to the jury under instructions not calculated to mislead, although entire accuracy in stating facts may not have been attained.

9. Partial insanity in the question of a will, considered in this case.

May 9th 1870. Before THOMPSON, C. J., AGNEW and SHARS-WOOD, JJ. .

Error to the Court of Common Pleas of *Franklin county:* Of May Term 1870, No. 31.

In the court below this was an issue on the will of Christian Bitner, deceased. The order of the court, March 15th 1869, was: "That an issue be framed to test the validity of the paper, purporting to be the last will and testament of Christian Bitner, deceased. That John Bitner, Samuel Bitner and Christian Bitner, executors of the said paper, be plaintiffs, and Joseph Bitner, Jacob Bitner, and George W. Brewer, guardian of George W. Bitner, Simon H. Bitner, David Bitner and Christian Bitner, minor children of Henry Bitner, deceased, be defendants in said issue."

[Bitner *v.* Bitner.]

The precept to the Court of Common Pleas recited that Joseph Bitner and others objected, "that the said Christian Bitner was *non compos mentis*, insane and of unsound mind, at the time he executed the said paper or instrument of writing, and that he signed his name thereto under duress, constraint and undue influence then exerted over him, the said Christian Bitner, by his three sons, John, Samuel and Christian, or some one of them;" * * * and that they "requested that an issue may be directed into our said court, to try by a jury the validity of said writing, and the matters of fact that may be objected thereto in our said court." The precept directed, "that an issue therein may be formed upon the merits of the controversy between the parties aforesaid, and tried in due course, according to the practice of our said court."

The declaration in the issue was on the affirmation by the plaintiffs and the denial of the defendants "that the said instrument was the last will and testament of the said Christian Bitner, deceased." The cause was tried August 17th 1869, before King, P. J.

The plaintiffs proved the execution of the will, dated June 14th 1865. In the first clause he gave all his estate to John, Samuel and Christian, and made them his executors, directing them to carry on the farming business as theretofore, with provisions in case of any of them marrying, and with a request that they should live together.

He gave to his son Joseph $5, "to be his full share of my estate. It is unnecessary for me to give the reasons why I give him no more." He gave to his son Jacob and his family, a home on the farm, his children to labor on the farm for his other sons, and he left it to his executors to aid them or not as they grew up. He declared he had given to Henry, a deceased son, so much of his estate as he intended for him and "I give nothing further to his children." He gave to two daughters Susan and Catharine, a living on the farms as long as they remained unmarried; if they married, Susan was to have $500 and Catharine $250, to be in full of their shares of his estate; the executors "in the item of pocket money to be liberal with them."

The plaintiffs rested.

The defendants called Jacob Harclerode. He stated that he had known the decedent from about 1829, he was then a "fine, quiet, peaceable neighbor; some time in the forties he became changed and kept himself in his house from three to five years."

The defendants then proposed to prove by this witness and others that prior to 1838 he was mild, modest, &c., that in 1839 he became insane and continued so four or five years, after which he attended to business until 1848 when he again became insane, left home, was absent six months; after these attacks until after the date of the will there was a change in his thoughts and habits;

[Bitner v. Bitner.]

he became irritable, suspicious, and harsh to his children, espe-
cially towards Joseph, Henry and Jacob; that his language was
vulgar and obscene in the presence of his daughters; spoke
indecently of his intercourse with women in the presence of his
family and strange ladies and gentlemen, and frequently attempted
improper familiarities with his own daughters.   The plaintiffs
objected to the testimony because it related to the decedent's con-
dition twenty years before; because obscenity is not evidence of
insanity, and because most of the offer was irrelevant.   The evi-
dence was admitted and a bill of exceptions sealed.

This witness and many others testified as to facts as stated in
the offer.   He testified that the decedent talked much about his
land, quoted the Bible very much, and immediately after doing so
would speak of the most licentiously indecent things and in the
most vulgar terms.   The witness testified also as to the industrious
character of his children.

On cross-examination he said that he thought the decedent
knew the value of grain and conversed about the value of his
farms.   A number of other witnesses testified much in the same
manner, and gave other testimony tending to show that he was
insane.   The principal part of his conversation according to the
testimony of most of the witnesses was about the Bible and on
indecent subjects, and he would change suddenly from one to the
other.   His indecent conversation was generally in the presence
of females.

Dr. J. L. Suesserott testified that he became acquainted with
the decedent after 1848; saw him frequently until three or four
years before his death, and had frequent conversations with him;
witness stated the subject of the conversations; the decedent was
disposed to moralize at one moment and the next to indulge in the
lowest obscenities.   The witness was not the decedent's physician.

The defendants then proposed to ask the witness:   "From the
conversations you had with Christian Bitner from 1848 up until
about four years before his death, what opinion did you form of
the condition of his mind during that time?"

The plaintiffs objected to the offer; it was admitted and a bill
of exceptions was sealed.

Witness testified:   "I believe that Christian Bitner was a man
of unsound mind during the period of my acquaintance with him.
On some subjects Mr. Bitner talked as rational as any man—on
ordinary subjects connected with his business as a farmer.   There
were other subjects on which he manifested that disposition that
monomaniacs evince, to recur to them on all possible opportunities.
He seemed to have a peculiar fondness for anything indecent."

The defendants called Mary Ann Bowman, who had been the
widow of the decedent's son Henry.   She married him in 1847
and he died in 1860.   She testified as to her husband's attention

[Bitner *v.* Bitner.]

to his father's affairs, and also as to similar facts with the preceding witnesses: The defendants proposed to prove by the witness the conduct of Christian Bitner with her and his own daughters, at night, whilst they were in bed. He was in the habit of coming to the room where they were sleeping, and attempting to pull the clothing off, and to get into their bed. That at other times he had attempted to take improper liberties with the witness, and his daughters and granddaughters. That he wanted witness, on one or more occasions, to leave her room and go to his room, for improper purposes.

The plaintiffs objected, on the ground that the testimony would not tend to establish insanity.

The evidence was admitted and a bill of exceptions sealed.

The witness testified that when she had been staying at the decedent's house in the harvest of 1861, conduct such as that mentioned in the offer had occurred. Much testimony on the part of the defendants was given for the purpose of showing that after 1839, and especially after 1848, he was insane. The opinion of the defendants' witnesses was, that he was incompetent to make a will. There was also evidence that he had been in great distress of mind as to the manner he had disposed of his estate; that he declared he had done wrong to some of his children; that shortly before his death he told Samuel Bitner he wished the will destroyed; stated the manner in which he wished his estate disposed of, and asked Samuel to see and have the will destroyed, which he promised to do; Samuel consulted the plaintiffs about it and they objected to any alteration; he saw decedent afterwards; both witness and decedent supposed "the will was destroyed by what passed between" them. There was evidence of similar conversations with others.

The plaintiffs in rebuttal gave evidence by many witnesses of the capacity of the decedent, of his business habits, shrewdness in making bargains. The witnesses to the will, and his attorney whom he consulted about it, testified that he fully comprehended its provisions; and that after the occasion spoken of by Samuel Bitner, he expressed his satisfaction with it.

John Bitner being on the stand, the plaintiffs proposed to ask him what the decedent said about his gifts to the poor? The defendants objected. The court overruled the question and sealed a bill of exceptions.

The decedent was the owner of a number of farms, and was estimated to have been worth about $150,000. There was evidence of his son Henry having brought suit against him for what he considered an unjust claim, which was settled in 1855, and his belief that Henry had wronged him in money transactions; also that he considered that Jacob was not qualified to manage property, and had been disobedient to him, and that Joseph had left home against his wishes. There was evidence also of his having

[Bitner v. Bitner.]

increased his estate very greatly, and that he had commenced life with keeping his children together to aid him in accumulating a large estate.

In surrebuttal, the defendants proposed to prove by Mrs. Bowman (Henry's widow) "that when her husband was on his death-bed, in February 1860, Judge Nill and his wife were out to see him; that Christian Bitner said to witness, 'I suppose Nill is out here to write Henry's will, but he has nothing to will, any how.' And further to prove by the witness that her husband had not $300 worth of property when he died, and never had any money of any considerable amount, so far as she knows, after the settlement of the suit in 1855." The plaintiffs objected to the offer, the evidence was admitted, and a bill of exceptions sealed. The witness testified to the matters contained in the offer.

The testimony on both sides was very voluminous, the trial having occupied ten days. What is given above, it is supposed, will sufficiently exhibit the case.

The plaintiffs' points and their answers were as follows :—

1. That is undue influence which amounts to constraint, which substitutes the will of another for that of the testator. It may be either through threats or fraud, but however exercised, it must, in order to avoid the will, destroy the free agency of the testator at the time the instrument was made. In this case there is no such evidence of undue influence as will warrant the court in submitting the question to the jury, and the evidence will not justify the jury in finding the fact.

Answer : " The position taken in the 1st point is affirmed. We know of no testimony in the case to show that the plaintiffs, the main objects of their father's bounty, took any part in, or had any knowledge of the making of the paper, now set up as the last will and testament of Mr. Bitner. There is evidence, it is true, that they interposed some objections to the revocation of the will, but which they deny on oath here; but there is not a spark of testimony that they employed any means whatever to induce him to make and execute the instrument produced as a will."

2. Inasmuch as the testator did not revoke the will in question, in accordance with the method prescribed by the Acts of Assembly, all declarations of the testator, made after the date of the will to S. Bitner and others, will not amount to a revocation of the will.

Answer : " We also affirm this point. The declarations of old Mr. Bitner cannot be regarded as a revocation. They can only be used, as we have stated, as bearing upon the question of delusion, to which we have at length referred."

3. The jury must not be misled into the belief that the disposition of the estate spoken of by the testator to S. Bitner and others, after the date of the will, is valid, and could be en-

forced in law. If the will in suit is set aside, the estate of Christian Bitner would pass to his children under the intestate laws, and they would all share alike.

Answer: " We also affirm the 3d point. We do not understand that the defendants take the position here combated."

4. The will of a man who has testamentary capacity cannot be avoided merely because it is unaccountably contrary to the common sense of the country. His will, if not contrary to law, stands for the law of descent of his property, whether his reasons for making it are good or bad, and in this view of the case he may prefer any or either of his children, or disinherit them altogether.

Answer: " It is undoubtedly true, as stated in this proposition, that every man of sound mind, memory and understanding may dispose of his estate as seemeth to him good, even if he outrages the common sense of all mankind; but when he does`so dispose of his property as to make it unaccountably contrary to the common sense of the country, that is a good reason for a close and strict inquiry into the condition of the testator's mind at the time of making the will, and the character of the will may be a circumstance of some importance, connected with other circumstances, to be considered by the jury on the question of the testator's sanity.

5. If the jury believe from the evidence in the case that at the time the will was made, Christian Bitner, the testator, had an intelligent consciousness of the nature and effect of his act; a knowledge of the property he possessed, and an understanding of the disposition he intended to make of it; he had the capacity to make a will that the law requires, and the will must stand.

Answer: " This point affirmed—if Mr. Bitner was not the victim of any delusion."

6. If the jury believe that the lascivious conduct of the testator, as manifested to his daughters, his granddaughter and daughter-in-law, and in the lewd and obscene conversations in their presence, and in the presence of others, was the result of a want of refinement, or blunted moral perceptions, then the evidence on these subjects is valueless in settling the question of testamentary capacity, and must be rejected from the consideration of the jury.

Answer: " We have already said that the obscene conversations and lewd conduct of Mr. Bitner have no significance in this case, except that if it be found by the jury that such conduct was the result of mental disease manifested in 1838, continuing then for four or five years, and again manifested in 1848, it increases the probabilities of other mental disturbances having the same origin."

7. If the testator was controlled in making his will by the fact that Joseph left home in opposition to his wishes, and had not

[Bitner *v.* Bitner.]

assisted in making any portion of his estate; and by the belief that Jacob was not only not qualified to hold and manage property, but was also disobedient to his authority; and by the belief that Henry was dishonest, and sought to recover money from him unjustly, by actions at law and otherwise; and if the jury believe from the evidence that there was any ground for these beliefs, then there was no delusion operating upon his mind which will avoid the will.

Answer: "If the proposition stated in this point was accompanied by the qualifications that there was no evidence whatever of any perversion of the natural affections of the father, originating in a causeless dislike of his children, we might possibly be justified in affirming this point. We have already briefly adverted to the relations between Mr. Bitner and his children, and referred it to the jury to say whether the enmity of the father was justified by the facts in the case, or whether it was the result of delusion. If, however, the father was possessed of a sound mind, free from delusion, he might, for any reason he thought proper, disinherit these sons. There is no limitation to the *jus disponendi*, except want of age and absence of sufficient judgment to dispose of his estate with judgment and discretion, which the law holds to be the evidence of a sound mind."

8. If the jury believe from the evidence of William B. Gabby and other witnesses produced by the defendants, that Christian Bitner began life with the determination to keep all his children about him to work for him, the proceeds of their joint labor to be invested in land, so as to accumulate a large estate, to be left to those who remained with him and were obedient to his wishes, and that he persisted through life in this purpose, and was governed by these views in making his will, then there is no delusion and the will must stand.

Answer: "We cannot affirm this point. The case does not turn upon the facts here assumed, but upon the question of the soundness of the testator's mind."

The defendants' points and their answers were as follows:—

1. If the jury is satisfied from the evidence that Christian Bitner was at one time insane and deranged for several years, such insanity and derangement is presumed to continue, and the burden of proof lies in such case upon the party asserting the validity of the will. The proof to be available, must show that there was not merely a cessation of the violent symptoms of the disorder, but a restoration of the faculties of the mind sufficient to enable Christian Bitner to judge soundly of the act he was doing; and the most satisfactory evidence of the soundness of his mind at that time, would be that of the counsel who wrote the will and who attested it as a subscribing witness.

15 P. F. SMITH—23

[Bitner *v.* Bitner.]

Answer : " When general insanity is established, it is incumbent upon the party setting up a written instrument as a will, to show that the testator was of sound mind when it was executed.   We are not prepared to say that it is absolutely essential that all the subscribing witnesses to the will, when there are more than two, should be called.   Doubtless the scrivener that wrote the will, especially when no one else was present when it was written, would be better able to describe the manner in which it was dictated, and the reasons that were given for excluding any of the members of his family from any portion of his estate.   That some things were said and done at the time that might shed some light upon this peculiar will, is very probable.   We are left in the dark as to what they were."

2. If the jury believe from the evidence that Christian Bitner, at the time he signed the paper in dispute, and for many years before, labored under an insane delusion in regard to the children he disinherited, or some of them, and had come to believe that they, or any one of them, were disobedient, dishonest, treacherous and lazy, and had threatened to kill him, when in truth and in fact all of said children were obedient, honest, industrious and kind and affectionate to their father, and had never threatened to kill him ; and if the jury further believe, that the pretended will was made under the influence of this delusion, then such paper is not his will, and the verdict must be for the defendants.

3. If the jury believe that Christian Bitner, when he made his pretended will, was laboring under such insane delusion about the children, or some of them, whom he disinherited—as is supposed in the several points—and the paper was the offspring of such delusion, it is invalid, although he was sane in other respects on ordinary subjects, and his capacity to understand the paper and to manage his business wisely and shrewdly, would not furnish the jury in such case with a correct standard to judge of his fitness to make a will.

Answer : " Taking these points together we affirm them."

4. In deciding upon the existence of the supposed insane delusion of Christian Bitner towards the children whom he disinherited, or some of them, and the state of his mind when he signed the paper in dispute—the intrinsic evidence of the will itself arising from the injustice and unreasonableness of its provisions—taking into view the state of his property and family, and the claims of the children whom he disinherited, is competent and proper for the consideration of the jury ; and when such unreasonableness and injustice are very great and not satisfactorily explained, the jury ought to give great weight to such evidence.

Answer : " We have already said that the contents of the will are proper matters to be considered by the jury upon the question of sanity or insanity ; and when the provisions of the will are

[Bitner *v*. Bitner.]

apparently unjust and unreasonable, if other facts and circumstances point to the incompetency of the testator to make such will, by reason of unsoundness of mind, the manner in which he has disposed of his property may be called in to support such other facts and circumstances; but apart from the extrinsic evidence the contents of the will, no matter how unjust they may be, cannot avail to annul the testament.

The court charged :— * * *

" Every man has the right to say how his estate shall be disposed of after his death, and it cannot be interfered with, whether he makes a wise or unwise disposition of it.    The only things the law requires are, that he shall be of sufficient age, and be of sound and disposing mind, memory and understanding at the time of the execution of his will.

" The best, most comprehensive, and at the same time the simplest definition of testamentary capacity that we have seen is, that the testator shall have mind enough to know and appreciate his relation to the natural objects of his bounty, and the character and effect of the disposition of his will.    When this appears, the law will sustain the testament, regardless of its contents.

["The will in question is, it is said, manifestly unjust, unequal and unreasonable in its provisions, excluding some of the natural objects of the testator's bounty altogether, and giving the merest pittance to others.  This allegation seems to be warranted by the evidence, and indeed appears on the face of the instrument.   Such a disposition of so much property as belonged to Mr. Bitner, whilst it will not, *per se*, avoid the will, is a fact that demands a close and scrutinizing inquiry into the condition of the testator's mind at the time it was executed, and may possibly have much to do with the question involved in this issue.   If the discrimination made between the children was, as the defendants contend, the offspring of an unnatural and unwarrantable dislike of the children unprovided for, resulting from an insane delusion in regard to their fidelity and obedience to the parent's commands, the will cannot, and ought not, to be sustained.]

" It is not pretended that Christian Bitner was entirely bereft of reason, or that he was a lunatic.    The whole evidence in the cause proves the reverse of this.    In the ordinary transactions of life, in his case very numerous, in his dealings with his neighbors, and the purchase of real estate, he is proved to have been more than ordinarily shrewd and sagacious, and possessed of sufficient mental ability to make a will.    But it is contended that his natural ability was warped and perverted by an insane delusion in regard to some of his children, and also in regard to women.

[" Many years ago, as early as the year 1838, he seems to have labored under an aberration of mind of a serious character, that continued for some time, four or five years, during which time he

[Bitner *v.* Bitner.]

secluded himself from society, and was incompetent to attend to his affairs. After that he came out and resumed the management of his farming operations, and attended to his business up to about the year 1848, when he had another spell, as it is called by the witnesses, and left his home and family and remained away eight or ten months. After his return, he again took the management of his farms, and continued to manage them up to the time of his death.]

"Prior to the time his mind was first disturbed, the witnesses say he was a man of mild and amiable temper and disposition, fond of his family and regardful of the decencies and proprieties of social life. But afterwards he is represented as having become very harsh and exacting towards his family, and entirely changed in his deportment, indulging constantly in the use of the most obscene language and stories in the presence of his wife and daughters, and strangers, both male and female, and appeared to take special delight in introducing this filthy conversation at his table. He pursued this course so persistently as to induce many persons coming in contact with him, to regard him as insane in that respect. The evidence on this point is so full that we are not required to notice it in detail. Besides his disposition to indulge in language of this sort, he seems also to have been under the influence and dominion of the most disgusting lechery, impelling him to make assaults even upon his own daughters and his daughter-in-law. Yet notwithstanding all this, we are required to say to you, that if this disorder of mind, if there was such disorder, was limited to this subject alone, it will not prove a want of capacity to dispose of his property by will. But if this unnatural propensity was the result of the insane condition of mind, that first developed itself in 1838, and afterwards in 1848, it increases the probabilities of other mental disturbances proceeding from the same cause; and in that point of view, and that only, can it be of any importance, or be entitled to any weight in this cause.

["The main ground on which the contestants of the will rely for setting it aside, is that Christian Bitner entertained the notion that the best mode of governing a family, was that which prevailed during the times of the patriarchs, when the head of the family kept together as long as he lived—and some of them lived to a good old age—all of his descendants who were subject to his control and government; and finding that some of his children, particularly Joseph, were disinclined to conform to his views, he conceived an unjust and unnatural hatred and antipathy against them and cultivated it to such a degree, that in consequence of the previous mental malady to which we have referred, it readily assumed the form of an insane delusion. The evidence to justify such a conclusion should be clear and convincing. If it has been established, we have no hesitation in declaring that it evinces such

an absence of a sound and disposing mind, memory and understanding, as will avoid the will in controversy. This is the great and controlling question in the case.]

"This species of dementia is sometimes termed monomania, which is unsoundness of mind on one or more subjects, and to all appearances sane on all others. But it may be more properly termed partial moral mania, developing itself in this case in a perversion of the natural affections, causing Mr. Bitner to hate and detract without cause, those he ought to love and treat with kindness. The books contain much learning on this subject, to which we might advert at some length, but the purposes of this trial do not require us to occupy your time in doing so.

"The special delusion contended for here is the unnatural and causeless antipathy of Christian Bitner to his sons Joseph, Henry and Jacob, which, if it be proved to exist, might affect the disposition of the decedent's property. How far the defendants have succeeded in satisfying you of the existence of such a delusion, is a question for you to decide.

["In reference to Joseph, it is not denied that his father became displeased with him for leaving home and for moving into a slave state. It appears he was also displeased with him about a piece of timber land that Joseph intended to purchase, but which the old man said he would purchase and let him have, and which, after it was purchased, the father refused to let him have, which caused some altercation on his part. The jury will remember the testimony on these points, and say whether the father's dislike was reasonable or unreasonable, and if unreasonable, whether it took the shape of an insane delusion. It seems to be very clear that this dislike of Joseph was the cause of his being left out of the will. His father told one of the witnesses that he would be revenged of Joseph; and after the will was made, the father became reconciled to his son, and regretted that he had excluded him from his bounty. I repeat it, that it is for you to determine whether such dislike was the result of an insane delusion.]

["Henry shared liberally, at one time, in his father's confidence, and was intrusted with the management of his business, while he was unable to attend to it himself; but the old man's feelings underwent a decided change. The father gave as a reason for it, that he had acted dishonestly towards him, and used money that he ought to have paid over to him. You will remember the proof in this part of the case—the transfer of one of the instalments of the Zent judgment to Henry, the action for wages and the subsequent settlement of the controversy, in which Henry abandoned his claim under the assignment—and the testimony of Mrs. Bowman, who was the widow of Henry. It is most true that the indignation of the old gentleman was greatly excited, and as a consequence thereof the children of Henry were entirely

[Bitner *v.* Bitner.]

unprovided for in the will.   How far the father was under a delusion we leave it to you to say.]

["With respect to Jacob, we remember no particular evidences of hostility.   The father always exacted from him, both before and after his majority, as he did indeed from all his children, the most implicit obedience to his commands, and constant and unremitting labor in his service, in view, doubtless, of his often-expressed purpose to combine the efforts of his whole family for the accumulation of a large landed property, to put him on a level with the Wilsons and Beatties.   He also seemed to have no confidence in the ability of Jacob to take care of property.   We cannot undertake to say that there was any delusion in respect to Jacob, or evidence that will justify you in saying so.]

["The daughters of Mr. Bitner have been, in a great measure, disinherited.   Why they were not better provided for than they seem to have been does not distinctly appear,—whether it was because their father did not wish them to marry, or whether it was the result of that detestable notion that seems to prevail in some communities, that daughters are not worthy of the same measure of affection and protection as sons, we do not pretend to know.   It appears that the father thought it enough to provide them a home and support on his farms so long as they remain unmarried, and to give to one of them $500 and the other $250, in case they marry.]

"Now, this anger of the father towards some of his children, or his want of confidence in others, or his neglect to make suitable provision for those that needed it perhaps the most, carried even to the extent of disinheriting one of them, and the children of another altogether· and to provide a bare living for the others, does not of itself avoid the will, unnatural and unreasonable as it may be, unless you are satisfied that the manner in which Mr. Bitner disposed of his estate was as we have already said the result of an insane delusion in reference to these disinherited children.

"How are you to determine the existence of this alleged delusion?   The books furnish numerous instances of partial insanity, exhibited by a want of just sense of affection and decency; by hating, without a cause, persons formerly much loved; by a delight in cruelty; by being offended in not receiving the respect and attention to which such delusion may persuade the party he is entitled to, and in numerous other ways.

["To one or other of these classes it is insisted, by the contestants of the alleged will, that Christian Bitner belonged.   A number of witnesses have been examined to this point, and among them Dr. Suesserott and Emanuel Kuhn, who both express the opinion that Christian Bitner labored under a delusion in regard to some of the children.   Mr. Kuhn regarded his conduct towards Jacob as an insane delusion.   It is not our purpose to weary you

[Bitner *v.* Bitner.]

by reciting the voluminous testimony taken in this case. The patient attention you gave to the witnesses as they delivered their statements, and the discussion of this evidence by the counsel, renders it unnecessary, as we think, to do so. Whilst Mr. Bitner was manifesting his dislike of Joseph, he stated to a Mr. Vanderau that he would be revenged of him for leaving him in the way he had done.]

["As tending to establish this point, the counsel have commented upon the conduct and declarations of Mr. Bitner in 1867 and 1868, after he made his will, in which he regretted that he had made it, and endeavored to induce his children to have the will changed, as some evidence that he acted under mistaken views in reference to the disinherited, in disposing of his property as he had done. These declarations do not amount to a revocation, as the law hints at but one way of revoking a will lawfully made, but we are of opinion that they may be considered by you in relation to the point we are now considering—namely, the question of delusion.]

"The existence of delusion in regard to some subjects, is not at all inconsistent with soundness of mind on other subjects. A man may be of sound mind in regard to his dealings, and may be under the influence of an insane delusion in regard to his children. And 'whenever it appears that the will is the direct offspring of the partial insanity, or monomania, under which the testator was laboring, it should be regarded as invalid, though the general capacity is unimpeached.' * * * Wife and children are the natural objects of a man's affection and regard, and when they are overlooked in the disposition of the estate, the reason for doing so may, as we have already intimated, be inquired into. We don't mean by this, however, that a man of undoubted testamentary capacity may not, in the disposition of his estate, exclude some of his children from a participation in it. It is simply a proper subject for scrutiny and investigation." * * *

The verdict was for the defendants.

The plaintiffs removed the case to the Supreme Court. They assigned a number of errors:—

1–4. The admission of the evidence on the part of the defendants which was objected to.

5. The rejection of the plaintiffs' offer.

The remaining assignments were to the answers to the points and the portions of the charge included in brackets.


*F. M. Kimmell* (with whom were *W. S. Stenger* and *W. Mc-Lellan*, for plaintiffs in error).—The evidence rejected was proper to show the condition of the decedent's mind: 1 Greenl. Ev. sect. 445–449.

[Bitner *v.* Bitner.]

*J. McD. Sharpe* (with whom were *W. U. Brewer* and *G. W. Brewer*), for defendants in error.—The character of a charge is not to be judged by disjointed sentences: Helfenstein *v.* Leonard, 14 Wright 462; Carothers *v.* Dunning, 3 S. & R. 379; Watts *v.* Cummins, 9 P. F. Smith 84. The expression by an expert of an opinion on the question of sanity, is proper: 1 Redfield on Wills 140, 141; Rambler *v.* Tryon, 7 S. & R. 90; Wogan *v.* Small, 11 Id. 141; Logan *v.* McGinnis, 2 Jones 31; Wilkinson *v.* Pearson, 11 Harris 117; Poole *v.* Richardson, 3 Mass. R. 330; Titlow *v.* Titlow, 4 P. F. Smith 216; Irish *v.* Smith, 8 S. & R. 573; McTaggart *v.* Thompson, 2 Harris 149. There will not be a reversal for harmless mistakes: Bunting *v.* Young, 5 W. & S. 188; Quinn *v.* Crowell, 4 Wharton 334; U. S. Bank *v.* Macalester, 9 Barr 475: Garrigues *v.* Harris, 5 Harris 344; Scott *v.* Baker, 1 Wright 330; Daniel *v.* Daniel, 3 Id. 191; Lothrop *v.* Wightman, 5 Id. 305; Hill *v.* Meyers, 7 Id. 175. Points need not be answered in the very words put: Coates *v.* Roberts, 4 Rawle 100; Geiger *v.* Welsh, 1 Id. 349; Utt *v.* Long, 6 W. & S. 174. The answers to all the points on the same subject should be taken together: McHenry *v.* McCall, 10 Watts 471; Hood *v.* Hood, 1 Casey 417; Groft *v.* Weakland, 10 Id. 304. The court may qualify an affirmative answer to a point: Columbia Bridge Company *v.* Kline, Brightly's R. 320; Woodwell *v.* Brown, 8 Wright 121; Leech *v.* Leech, 9 Harris 67. Declarations of the decedent about his will and after its execution were proper; 1 Redfield on Wills 546, 547; Waterman *v.* Whitney, 1 Kernan 157; Chess *v.* Chess, 1 Penna. R. 32; Irish *v.* Smith, 8 S. & R. 573. Partial insanity is a ground for avoiding a will: 1 Redfield on Wills 71–79; Shelford on Lunacy, 39–43; Ray Med. Juris. § 129, 274; Dew *v.* Clark, 3 Addams 79; Johnson *v.* Moore, 1 Little 371; Am. Seaman's Friend Society, 43 Barb. 625; Florey *v.* Florey, 24 Alabama 241; Jenckes *v.* Smithfield, 2 R. I. 255; Leech *v.* Leech, 9 Harris 67; Boyd *v.* Eby, 8 Watts 68. Evidence of insanity may be drawn from the will: Patterson *v.* Patterson, 6 S. & R. 55; Baker *v.* Lewis, 4 Rawle 357; Rees *v.* Stille, 2 Wright 138; Dean *v.* Negley, 5 Wright 316; 1 Redfield 514, 515.

The opinion of the court was delivered, May 19th 1870, by

AGNEW, J.—The looseness with which feigned issues are so often formed is a source of frequent regret, which we had occasion to notice last year in a case from Luzerne county. This case is another instance. The only issue presented by the pleadings is whether the writing was the last will and testament of Christian Bitner. But this presented no issue of fact. It might not have been his last will for various reasons. of law and fact, as want of due execution, revocation, duress, insanity, &c. Such an issue withdraws the will from the exclusive jurisdiction of the register

[Bitner v. Bitner.]

or Register's Court, and commits it to the Common Pleas which has no jurisdiction except to try issues of fact only sent to it for a trial by jury. The register's precept in this case sent two issues of fact to be tried, to wit: the insanity of the testator and the undue influence of the three sons. The defendants should have replied these matters to the plaintiffs' declaration so as to raise the direct issues of fact sent to be tried. The Court of Common Pleas and the jury would then have had the issue directly in view.

The plaintiffs asked the court to charge that there was no evidence of undue influence on part of the three sons, and the court affirmed their point. The insanity of the testator was therefore the only question left to be decided by the jury. The unsoundness of mind which was set up to destroy the will was not total insanity, but a special form of it, which, while it left the mind of the testator capable of many acts of apparent soundness, led him to form erroneous views of the character and conduct of his sons Joseph, Henry and Jacob, resulting in an insane delusion as to them, entering into the composition of his will. In order to understand the course of the trial, and solve the errors assigned, it is necessary to notice the allegations of fact constituting what has been termed the theory of the cause. It was asserted, and proof was given to show, that Christian Bitner had been insane at two periods of his life beginning in 1838 and in 1848, and that this insanity had developed an unnatural and disturbed condition of mind which had changed his character, and affected his conduct to such an extent, as to evidence a delusion of mind in relation to the three sons named, and produce a causeless antipathy toward them.

If a mild, amiable, quiet and modest man should become insane, and afterwards, though recovered so far as to transact his own business with apparent discretion and judgment, and in many things to appear to be in his right mind, yet should evidence a total revolution in his character, and become irritable, suspicious and harsh toward his children or some of them, become exceedingly vulgar and obscene in his conversations, outraging all sense of decency in the presence of his family and of strangers, and should exhibit the most foul desires and disgusting lechery toward his own daughters and other females; it would be difficult to ascribe such a revolution of character and such conduct otherwise than to the precedent insanity which had thus developed an unnatural, morbid and unsound condition of mind. Such an unsoundness would not be inconsistent with an apparent right use of the faculties in many respects, and yet might strongly influence his conduct toward those against whom he exhibited these new traits of character. In an inquiry into an unsoundness of this kind, it is evident that the testimony ought not to be confined within a very narrow range, but that all those things which tended to show that the character of the man had changed since his attack of insanity

should be received in evidence. Hence in the case of one who had been mild, amiable and modest, irritability, harshness, passion, suspiciousness, vulgarity, obscenity and openly avowed lechery would all tend to the same point in the proof that his insanity had left the mind in an unsound and unnatural condition. These remarks dispose of the first, third and fourth bills of exception, which are not sustained. As to the second, it is only necessary to say that the testimony of Dr. Suesserott exhibits such an acquaintance with the testator, his habits, conduct and conversations for a long period of years, as to make his opinion competent to be given to the jury. The fifth error needs no comment; it was not error to reject the declarations of the testator of his own charities. From what has been said already as to the only issue in this cause, the questions of undue influence, revocation and the effect of setting aside the will were not before the jury, and therefore the answers to the 1st, 2d and 3d points of the plaintiffs were immaterial.

The fact that a man's will is unaccountably contrary to the common sense of the country is not sufficient, *ipso facto*, to set it aside. The testator's will is the law of his property. But certainly that which outrages common feeling, and displays a want of ordinary natural affection, is a fact to be considered along with other evidence on the question of unsoundness or delusion of mind. The assignments of error to the plaintiffs' fourth point and the defendants' fourth point are not sustained. We discover no such inconsistency in the answer to the plaintiffs' fifth point as could injure the plaintiffs. The second clause of the answer, to wit: "if Mr. Bitner was not the victim of any delusion," was evidently said by way of recalling the attention of the jury to the true question of fact before them. And if we should examine the answer critically, an intelligent consciousness of the *nature* and *effect* of an act, is not plainly inconsistent with the existence of a delusion leading to and producing the act; so as to leave the jury in doubt of the meaning of the court. Christian Bitner might have been perfectly conscious of the nature of his testamentary provision, and aware that its effect was to disinherit the three sons, and yet laboring under a delusion of fact as to their conduct, which led him to consider and do the thing he contemplated, consciously and with intelligence.

The answer to the sixth point of the plaintiffs is disposed of by what we have already said upon the questions of evidence. We discover no error in it.

The plaintiffs' seventh and eighth points required the court to say in case the facts were found as stated in the point, that the will was not void and must stand. But this the court could not do without narrowing the question of insanity to the precise state of the facts stated in the point. The field of the facts was broader and embraced questions of actual unsoundness of mind and per-

[Bitner v. Bitner.]

verted feelings and affections, which may have shared in the production of the will, even though Christian Bitner might have had the grounds of fact influencing his testamentary disposition as stated in the points. We cannot say, therefore, that the court erred in the qualifications introduced into the answers; especially in view of the explicit and clear instructions contained in other parts of the charge.

As to the remaining assignments of error to the answers to the defendants' points, and to the general charge, we need say nothing more. Almost all the judge said appears to have been excepted to, perhaps with the view of bringing to our notice the entire spirit and scope of the charge. But although the mind of the judge appears to have inclined strongly to the belief that the testator was influenced by morbid feelings, and was unjust to his three sons, Joseph, Henry and Jacob, we are not able to discover from the charge that the case was presented to the jury in such an unfair and one-sided manner as to mislead them. Very strong expressions of opinion on the facts are tolerated, indeed sometimes may be necessary. Even entire accuracy in the statement of facts may not be attained; yet, when the case is left fully and clearly to the jury under instructions not calculated to mislead, we are not in the habit of reversing. Finding no material error in the record, the　　　　　　　　　　　　　　　Judgment is affirmed.