## Miller et al. *v.* Oestrich, Appellant.

[Marked to be reported.]

*Will—Issue devisavit vel non—Undue influence—Evidence.*

Where there is no evidence that a legatee in a will solicited or requested testatrix to make the legacy, and it appears that the legatee neither wrote the will nor procured it to be written, evidence that testatrix and the legatee were very friendly, or that she nursed testatrix during her illness, or that she managed testatrix's affairs, or that she spoke disrespectfully of contestant, is insufficient to prove undue influence, and such evidence should not be submitted to the jury.

*Testamentary capacity—Will—Evidence.*

A person of sound and disposing memory is one who has a full and intelligent knowledge of the act he is engaged in, a full knowledge of the property he possesses, and intelligent perception and understanding of the disposition he desires to make of it, and of the persons and objects he desires shall be the recipients of his bounty. It is not necessary that he should collect all these in one review. If he understands in detail all that he is about and chooses with understanding and reason between one disposition and another, it is sufficient for the making of a will.

On the trial of an issue devisavit vel non to determine the testamentary capacity of testatrix, both subscribing witnesses testified that at the time the will was made there was nothing unusual in the manner of the testatrix to indicate mental unsoundness. Other disinterested witnesses testified

that immediately before and after the execution of the will, testatrix, though weak, was able to transact business, and that she was sensible and intelligent. By her will she gave legacies of moderate amount to her nurse, who had been unusually kind and attentive to her, and to her physician. It appeared from the evidence on behalf of contestant that testatrix took morphine, and that, when awaking from the effects of the drug. she was subject to delusions. It also appeared that she had made frequent gifts of money and specific articles to those about her, and that in two instances she had given away valuable pieces of real estate. It appeared, however, that the gifts of the real estate had been made to persons who had been kind to her, and for whom she entertained an affectionate regard. *Held*, that the evidence was insufficient to show lack of testamentary capacity, and was properly withdrawn from the jury.

*Mental unsoundness—Use of drug—Evidence.*

While the proof that the use of a particular drug will cause mental unsoundness may be useful in ascertaining the cause of actual mental unsoundness, it is of no avail to establish the existence of such unsoundness unless the other proof in the case clearly shows that it was really present.

Argued April 18, 1893. Appeal, No. 82, Jan. T., 1893, by defendant, Mary Oestrich, from judgment of C. P. Huntingdon Co., May T., 1892, No. 14, on verdict for plaintiffs, David P. Miller et al. Before STERRETT, C. J., GREEN, MITCHELL, DEAN and THOMPSON, JJ.

Issue devisavit vel non. Before FURST, P. J.

The issues to be tried were as follows :

1. Whether the paper writing dated the 6th day of November, A. D. 1891, purporting to be the last will and testament of Eliza E. Watson, was signed by her.

2. Whether said paper writing dated the 6th day of November, A. D. 1891, purporting to be the last will and testament of Eliza E. Watson, if signed and executed by her, was signed through or by the undue influence of Catharine Corbin, and whether said Catharine Corbin procured it to be signed by fraud and by exercising an undue influence over her.

3. Whether the said Eliza E. Watson at the time of the alleged signing of the said paper writing, dated November 6, 1891, purporting to be her last will and testament, was of sound and disposing mind, memory and understanding, and competent to make a will.

The facts appear by the opinion of the Supreme Court.

The court withdrew from the jury the question of undue in-

fluence and testamentary capacity, and submitted the question of the genuineness of the signature alone. [10]

Verdict and judgment for plaintiff.   Defendants appealed.

*Errors assigned* were (10) above instructions, quoting them.

*W. McK. Williamson* and *George B. Orlady*, for appellant.— The trial judge erred in expressing his private opinion of the evidence : Proffatt on Jury Trial, 306 ; Greenleaf on Evidence, § 691; Curtin v. Somerset, 140 Pa. 70 ; Rosenagle v. Handley, 151 Pa. 107; Steinbrunner v. Ry. Co., 146 Pa. 504; R. R. v. Alvord, 128 Pa. 42.

Relating to the mental capacity of Mrs. Watson and the undue influence practiced upon her, counsel for appellant contend that after establishing the intimate relations existing between Mrs. Watson and Catharine Corbin, it is a matter of law that they were confidential, and the burden of disproving undue influence was on the plaintiff; and confidently submit the evidence in this case to determine them as present and potent powers affecting the making of this will : Dean v. Negley, 41 Pa. 312.

When a considerable portion of the estate of the testator, whose mental faculties are impaired by disease, bodily suffering, trouble, etc., though not enough to destroy testamentary capacity, is given to one occupying a confidential relation, it raises a presumption of undue influence : Jones's Ap., 11 W. N. 258; Darlington's Ap., 86 Pa. 512; Miskey's Ap., 107 Pa. 612; Pittock's Est., 9 Pa. C. C. 457; Boyd v. Boyd, 66 Pa. 283; Cuthbertson's Ap., 97 Pa. 163 ; Yardley v. Cuthbertson, 108 Pa. 395; Darlington's Est., 147 Pa. 624; Herster v. Herster, 122 Pa. 252; Worrall's Ap., 110 Pa. 349; Smith v. Loafman, 145 Pa. 628.

The question to be solved by the jury—whether there was mental incapacity or undue influence practiced—arises under the circumstances, and the question is one of degree.   There is no possibility of mistaking midnight for noon, but at what precise moment twilight becomes darkness is hard to determine : Carter's Est., 29 W. N. 436.

*John M. Bailey* and *John H. Orvis, R. K. Foster* with him, for appellees.—Old age, failure of memory or habitual drunkenness will not per se constitute incapacity to make a will. The test of capacity is, that the testatrix's mind and memory were sufficiently sound to enable her to know and understand the business in which she was engaged at the time she executed her will. As a general proposition, less capacity is sufficent to make a valid will than to transact business : Thompson v. Kyner, 65 Pa. 368.

Testamentary capacity is the normal condition of one of full age, and the affirmative is with him who undertakes to call it in question, and this affirmative must be established not in a doubtful but in a positive manner: Grubbs v. McDonald, 91 Pa. 236 ; Wilson v. Mitchell, 101 Pa. 495 ; Shaver v. McCarthy, 110 Pa. 339 ; Harmony Lodge's Ap., 127 Pa. 269 ; Napfle's Est., 134 Pa. 492 ; McKim's Est., 27 W. N. 110 ; McMahon v. Ryan, 20 Pa. 329 ; Eckert v. Flowry, 43 Pa. 46 ; Wainwright's Ap., 89 Pa. 220 ; Trost v. Dingler, 118 Pa. 259 ; Thompson v. Kyner, 65 Pa. 368.

OPINION BY MR. JUSTICE GREEN, October 2, 1893 :

The fact of the execution of the will in dispute by the testatrix is conclusively established by the verdict upon ample testimony, and therefore any question upon that subject is now out of consideration. All the specifications of error may be disposed of by considering whether there was sufficient evidence to leave to the jury the questions whether the testatrix was of sound mind at the execution of the will, and whether the will was procured to be made as it is, by means of undue influence.

So far as the latter question is concerned it must be observed that the only person who is claimed to have exerted undue influence upon the testatrix is Mrs. Corbin. The contention of the appellant upon this subject is embarrassed by the fact that the will in question gives a much larger proportion of the estate to the appellant than was given to her by any of the preceding wills made by the testatrix, and hence if Mrs. Corbin induced Mrs. Watson to make this particular will her efforts enured to the benefit of the appellant instead of her injury. Mrs. Corbin herself received a moderate legacy under the will,

and if the will is to be set aside on the ground that she unduly influenced Mrs. Watson to give her that legacy, there ought to be some evidence that she solicited it, and by undue importunity induced the testatrix to give her the legacy in question. But there is no such testimony in the case. Not a witness testifies to having ever heard Mrs. Corbin solicit or request Mrs. Watson to give her any legacy at all. It is not enough to prove that she and Mrs. Watson were very friendly, or that she nursed Mrs. Watson during her sickness, or that she managed her affairs or that she spoke disrespectfully of the appellant to her, or that Mrs. Watson was fond of her or had a high regard for her or did what Mrs. Corbin asked her to do. The question is did Mrs. Corbin induce Mrs. Watson by undue solicitation, or influence, to give her the legacy which is bequeathed to her by this will. Moderate solicitation is allowed under all the decisions, but here there is not the least particle of proof that Mrs. Corbin ever solicited, or in any manner requested, or even suggested, to Mrs. Watson the idea that she should give her by will, either this legacy, or any legacy whatever. Counsel for appellant do not refer us to any such testimony and there is none such anywhere on this record. How then could the court below refer such a question to the jury for their determination? What evidence would there be for the jury to act upon or to consider? The authorities cited for appellant upon the effect of one occupying a confidential relation taking a large benefit for himself under an instrument which he wrote himself or procured to be written, are inapplicable because Mrs. Corbin neither wrote this will, nor procured it to be written, nor induced the testatrix to give her the legacy bequeathed to her in the will, nor even solicited or requested the testatrix to give her the legacy.

We are therefore very clearly of opinion that the learned court below was entirely right in withholding from the jury the question whether Mrs. Corbin procured the will to be made by means of undue influence.

As to the question of mental unsoundness, it must be observed that the will of Mrs. Watson was written by a member of the bar who had been well acquainted with her for thirty years or more, who had transacted professional business for her during several years, who did not receive a single penny of benefit from

the will, and who testifies, without contradiction by any one, that he derived all his instructions for the preparation of the will exclusively from Mrs. Watson herself; that after he had written it he brought it to her and read it over to her, and left it with her over night. That when he called the next morning he asked her as follows: " Have you looked over the will and is it satisfactory? And she said she had, and that she had signed it, too, so that she wouldn't have to sign it when the men would be here." He also testified: " Q. Who dictated to you the provisions of this last will? A. Mrs. Watson. Q. Did she understand the business she was engaged in? A. I presume she did. Q. What was the condition of her mind on the day you took her directions as to the contents of her will? A. Well, as she appeared to me she was bright and cheerful and spoke in a businesslike way. . . . Q. What was her condition on the day she signed the will? A. I didn't observe anything different from what it was on the day before ; she spoke to me in a pleasant way, smilingly, said she had signed her name before we came in so that the men wouldn't see her write. . . . Q. Was there anything in her appearance or what she said to you either on the 5th or 6th of November that indicated any mental change in her from the time you first knew her? A. I didn't observe any; it didn't impress me that way. Q. Did any person else give any directions as to the contents of the will except Mrs. Watson? A. No one else did but Mrs. Watson. Q. Who was in the room when you took her directions. A. Mrs. Corbin ; Mrs. Watson gave me all the items of the will herself. Q. As you have inserted them? A. Of course ; all the items are precisely the way she gave them to me. I took them down, a short memorandum, so as to carry every item in my mind, and I believe I got every one in the will that she directed. Q. Was the will read to her before signing? A. I read it to her the evening I took it down to her, the 5th of November."

There is no testimony to impeach or contradict the foregoing statement of the scrivener, in the least degree. He was an entirely disinterested witness, having nothing to gain or lose by the establishment or defeat of the will. He was an attesting witness and was corroborated by the other attesting witness. On cross-examination he was asked : " Q. When Hooper came

in what was done and said—all that was done when he was in ? A. I don't remember of anything more being done than what I have stated, that when he came in I took up the will and asked Mrs. Watson whether that was her signature and whether she desired us to become witnesses to it as her last will, and she declared she did and we signed, and then the only thing further was I asked her what she wanted to do with the will. . . . . She told me to take the will with me and put it in my safe. . . . Q. She didn't tell you she had signed the will ? A. Yes, sir, she said she had signed the will. She said she had signed it, and made the remark that she had signed before the men would come so that she wouldn't have to write in the presence of men ; that is why I feel sure on that particular point."

The testimony of both the attesting witnesses was fully corroborated by that of Mrs. Corbin, and these three were the only persons present at the execution of the will. Mr. Simpson and Mrs. Corbin were the only persons present when the instructions were given by Mrs. Watson for the preparation of the will. The testimony as to what took place and what was said and done at the time the instructions were given, and at the time the will was attested, is so strong, full, clear and satisfactory that it would require testimony of a very serious, precise and positive character, to overcome it. In the case of Grubbs v. McDonald, 91 Pa. 236, we said : " Testamentary capacity is the normal condition of one of full age, and the affirmative is with him who undertakes to call it in question, and this affirmative he must establish not in a doubtful but in a positive manner."

As the evidence that Mrs. Watson gave all the instructions for the preparation of her will is entirely uncontradicted, and as the provisions therein contained are very much more liberal in favor of the appellant, than were those of all her previous wills, it is almost impossible to understand how it can be said that she did not understand what she was doing. The testimony to charge her with the want of understanding in that regard, which would be necessary to overthrow the will, would have to be of a most precise and specific character and would have to reach to the very vital substance of the adversary contention. The case is of a very unusual and unique character. The contest over the will is initiated and carried on by the per-

son who is much the largest legatee under its terms.  Usually these contests are conducted by persons who are either entirely left out of the will or who are cut off with a very small provision in their favor.  But here Mrs. Oestrich, who has much the largest legacy under the will, is seeking to set it aside, not because she does not get a liberal provision under the will, but because some legacies are given to others, two thousand dollars to a faithful nurse, the same amount to an esteemed and faithful physician, who is to give his services as executor as a partial consideration for his legacy, two legacies of a thousand dollars each to a brother and a niece, with a residuary provision in favor of her brothers and sisters.  It is practically these legacies to the others that the appellant wants and is seeking to get by this proceeding. The obstacle in the way of her success is a very serious one. Because, if the testatrix knew what she was doing when she gave to the scrivener the very precise instructions which are written in the will in favor of the other legatees, the will is a good and valid testament, notwithstanding any amount of mere theory in regard to the effect of taking morphia in moderate doses for any length of time, or of a few unimportant and merely temporary delusions, chiefly if not entirely resulting from the use of such a remedy.  How can it be said that the testatrix did not know that she was giving these various legacies to the several persons named, when it was she herself who dictated them, and directed them to be expressed in her will?  There is not a particle of testimony to prove that any one of these legatees, or any one else, ever solicited, or requested, or suggested to the testatrix the idea of giving these legacies by her will.  Why shall her desire, and her undoubted right, to give them be frustrated and taken from her, when she has herself clearly and solemnly declared, both verbally in giving her instructions, and in writing by her will duly signed and sealed, that such was her wish, her desire and intent?  If she did not know what she was doing, of course her testamentary act was nugatory.  But who does say, or who can say, and where is the testimony, any testimony, on this record, which shows, or tends to show, that she did not know perfectly well when she gave the instructions for these legacies, and signed, sealed, published and declared the paper in controversy to be her written will, that she did not know what she was doing?  There

. is no such testimony, not even a fragment of it, anywhere in the case. And in the absence of such testimony it was the duty of the learned court below to withdraw the consideration of such a question from the jury.

Now the kind of testimony by which the appellant seeks to make out the proof which the law requires in this class of cases is, that the testatrix was addicted to the use of morphia, and that in a few instances she had delusions as to seeing objects about her that had no existence. As to the use of morphia, it was most conclusively shown that she took it in moderate quantity, for a considerable time, for the purpose of obtaining relief from excessive pain resulting from most severe and long continued chronic rheumatism, and also at times to quiet restlessness and obtain sleep. It was abundantly shown by the medical testimony that this drug is constantly, and most beneficently given to unfortunate invalids afflicted with this dreadful disease, that it is given with perfect safety, that it always brings relief, and the great preponderance of the testimony was that it does not affect the mental power of the patient unless in extreme cases of excessive use. The dose taken by the testatrix was a pill containing the one eighth part of a grain, and it was testified that she took sometimes two, sometimes three, occasionally four or five, of these pills in a day and night. None of the physicians said that this was an excessive use, and nearly all of them said that, as the system becomes habituated to the use of the drug, it requires an increased quantity to produce the same effect, and the system is able to take it without serious effect upon the mind. One of the physicians for the appellant said, in answer to a hypothetical question, that he should expect a deleterious effect from the continued use of an eighth or a quarter of a grain, in the case of a patient susceptible to the use of an eighth of a grain, when such a patient would use continuously two to three pills of one eighth each, and he would expect the judgment to be impaired, also the will power and the ability to accomplish work. Other physicians thought differently. But the inconsequence of such a mode of proving mental unsoundness becomes at once apparent when it is considered that only actual, real, mental unsoundness at the time of the testamentary act is the important subject of inquiry. While such proof may be useful in ascertaining the cause of actual

mental unsoundness, it is of no avail to establish its existence, unless the other proof in the case clearly shows that it was really present. In other words, unless the theory that it ought to exist, or might exist, be followed by proof that it actually did exist at the important moment, the theoretical proof is of no practical value in the contention.

There was also proof that on a few occasions the testatrix imagined she saw about her objects which were not present. An examination of the testimony shows that these occasions were of rare occurrence and of momentary duration, and they were easily accounted for as resulting from the use of morphia, particularly in awaking from its influence.

It was also shown that she was of an unusually generous disposition, making frequent gifts of money and specific articles to those about her, and in two instances giving away valuable pieces of real estate. It may be conceded that she was lavish in this respect, but these were gifts inter vivos, which she could make according to her pleasure, and which however unwise they were in a mere worldly point of view, are very far indeed from establishing mental unsoundness. She was at those times estranged from her daughter, and felt a desire no doubt to benefit the donees while she lived. The most important of these gifts, the one made to Lower, was made several years before her death to a person who had been kind to her, and for whom she at that time entertained an affectionate regard. The other gift of real estate was to her nurse, who constantly attended her and cared for her, and remained with her day and night and ministered to all her wants. The testatrix was a very great sufferer from a most painful disease, she was obliged to use crutches in walking for many years, and towards the last was confined to her bed constantly. To such persons the continuous presence and unceasing and kindly attentions of a faithful nurse are most grateful and comforting, and it is not at all surprising that a person so unfortunately circumstanced, and having the financial ability to do so, should take pleasure in making valuable gifts to such a friend. Persons who do such things are not therefore to be considered as insane. The foregoing were the leading facts alleged in support of the theory of mental unsoundness at the time the will was executed. They are totally inadequate to establish such a

condition, and no verdict could be sustained which avoided a will on such facts.

It was fully proved that Mrs. Watson transacted her own business up to the time of her death. She collected her own moneys, caused them to be deposited in bank, drew checks on the banks when she wanted money, employed and discharged her servants, paid them their wages herself, lowered the wages of one of her woman servants from $5.00 a week to $3.00, because she had her boy boarding in the house, settled and paid her taxes, paid her bills, and did whatever other things were required up to the time of her last illness and death. Here is the testimony of a tax collector who collected a bill of taxes from her on November 11, 1891, six days after the will in controversy was executed. " This is an unusual statement; there was her own tax and then half the Hefright and Watson taxes; her own tax was $144.26 and her half of the Hefright and Watson taxes, or the one fourth, was $60, the whole is $204.26 ; this is the receipt and statement. . . Q. Can you fix the date now when you were at Mrs. Watson's house ? A. Only from this. Q. Is that the day she paid you ? A. Yes, sir. Q. What day is this ? A. November 11, 1891. Q. On that day was she in your judgment capable of attending to business ? A. .Yes, sir. Q. Did she understand that business ? A. She certainly did. I called on her frequently for taxes still; I have been collector now since 1888 and I called on her every year ; and she just seemed as capable, only that she seemed weak ; she was in bed but she understood her business ; she said I came for taxes and she talked with me, and told Mrs. Corbin to get the money,—they' had it all prepared and I gave her a statement and the receipt. . . Q. Did you notice any difference in Mrs. Watson on the day she paid you this tax over any other time she paid you taxes, except as to her physical condition ? A. No, sir, not any."

Another witness, Mrs. Wilson, entirely disinterested, was with Mrs. Watson for an hour or more just after the will was signed, and just before it was attested, on the morning of the 6th of November, 1891. After saying that she had been in conversation with Mrs. Watson for an hour or an hour and a half she was asked: " Q. What was the manner of Mrs. Watson's conversation that day ? A. She was very sensible and intelligent— in a joking way we were talking. Q. You had talked with her

before that? A. Yes, sir. Q. Did you notice anything different in her manner and speech that day than at other times? A. I didn't. . . . Q. In your judgment was Mrs. Watson on that day competent to transact business? A. I should think so; I should feel positive she was; I didn't see anything wrong with the woman's mind; I never thought of such a thing."

There was very much more testimony as to acts, conversations and transactions of Mrs. Watson before, at the time of, and after the execution of the will, exhibiting her as a perfectly rational and responsible person, in the full possession of her faculties, and really nothing to show that she was irrational or incapable, except in the few instances of momentary delusion already referred to. No attempt was made or suggested to have her declared unsound or to take the management of her property out of her hands. No one seems to have thought there was any occasion for it. She was very feeble and weak physically, as a result of her sickness and advancing years, but mentally she was bright, intelligent and thoroughly conscious. There was much testimony in the case of a frivolous character and quite irrelevant to the main contention, and after reading it all over carefully we fail to discover any that would be sufficient to sustain a verdict against the will, and we therefore think that on the merits of the testimony the learned court below was entirely correct in withdrawing the questions of incapacity and undue influence from the jury.

The rule of testamentary capacity in Pennsylvania was carefully and comprehensively expressed in an opinion of this court, delivered by Mr. Justice TRUNKEY in the case of Wilson v. Mitchell, 101 Pa. 495, in which he said: "A man of sound mind and disposing memory is one who has a full and intelligent knowledge of the act he is engaged in, a full knowledge of the property he possesses, an intelligent perception and understanding of the disposition he desires to make of it, and of the persons and objects he desires shall be the recipients of his bounty. It is not necessary he should collect all these in one review. If he understands in detail all that he is about and chooses with understanding and reason between one disposition and another, it is sufficient for the making of a will. . . . To sum up the whole in the most simple and intelligent form— were his mind and memory sufficiently sound to enable him to

know and understand the business in which he was engaged at the time when he executed the will. . . . Neither age, nor sickness, nor extreme distress or debility of body will affect the capacity to make a will, if sufficient intelligence remains."

Upon the entirely uncontradicted testimony of the scrivener who wrote the will and attested it, and of the other attesting witness, and the highly corroborating testimony of Mrs. Wilson and Mrs. Corbin, the testatrix fulfilled every one of these conditions. She most certainly understood that she was making her will, as she sent for Mr. Simpson for that very purpose, she certainly knew her property, for she specifically disposed of it by mention, she of course knew who were the persons and objects of her bounty, for it was only her personal knowledge and desire upon that subject that were expressed in the will. It was she who named the legacies and devises and also the legatees and devisees,—the scrivener merely prepared the writing according to her personal instructions.

In the case of Wilson v. Mitchell, supra, a man over one hundred years of age executed a will by which he devised his property, one half to certain of his relatives, one fourth to his legal adviser, and one fourth to a woman with whom he had lived for many years and who took care of him. He was blind and partly deaf. His memory was treacherous as to recent events ; he would repeat the same thing several times, and slept almost constantly. In his prime his mental and physical vigor had been remarkable, and he had been observant of the proprieties of life; while in old age his vigor abated and he became extremely filthy in his habits. Some who had known him in the prime of life thought that he lacked testamentary capacity. Some time prior to the execution of his will he had made a somewhat similar disposition of his property by deed, which he revoked before executing his will. In a feigned issue of devisavit vel non to determine, inter alia, whether the alleged testator was or was not of sound and disposing mind, it was held that there was no sufficient evidence to sustain the negative of the issue and the court was right in taking the question from the jury.

On the trial several witnesses who knew the testator well testified that in their opinion he was unable to make a will, and a large number of medical witnesses testified to his mental in-

capacity in answer to hypothetical questions.   The court below withdrew the case from the jury on the question of mental soundness and we sustained that action.

In Shaver v. McCarthy, 110 Pa. 339, we said, reaffirming Mitchell v. Wilson : " But whilst testamentary incapacity may result either from mental derangement accompanied by delusions or from mental imbecility, neither or both of these states or conditions of the mind are the exact equivalent of what is called testamentary incapacity; for the existence of delusion on one subject is not inconsistent with sufficient soundness of mind on another (Bitner v. Bitner, 65 Pa. 347 ; O'Neil v. Evans, 1 Am. L. J. 522), and mere feebleness of intellect is insufficient to avoid a will : Daniel v. Daniel, 39 Pa. 191.   From whatever cause the alleged incapacity may be supposed to arise, if the testator has mind and memory sufficiently sound to dispose of his estate with judgment and discretion, the disposition is valid; all that can be required in any case is that the strength of the mind shall be equal to the purpose to which it is applied."

In the Estate of Baltzer Napfle, 134 Pa. 492, we held that where the testimony on an application for an issue devisavit vel non, disclosed that the testator, though of great age, and his eyesight and hearing and perhaps his memory defective, yet gave his own directions for the drawing of the will and the codicil, and at different times afterwards referred to their provisions, a case was not presented which would sustain a verdict against the will, and an issue was properly refused.

It is unnecessary to extend the discussion or to review the assignments of error in detail.   As we are of opinion that a verdict adverse to the will could not be sustained, the individual specifications of error become unimportant and need not be considered.

The judgment of the court below is affirmed.