J-A01006-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| KENNETH J. SHEPLEY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GERTRUDE A. RICHARDSON A/K/A | : | No. 3211 EDA 2019 |
| GERTRUDE A. SHEPLEY | : | |

Appeal from the Order Entered October 8, 2019
In the Court of Common Pleas of Monroe County Orphans' Court at
No(s): No. 32-OC-2012

BEFORE:  BENDER, P.J.E., OLSON, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:        **FILED:  FEBRUARY 19, 2021**

Kenneth J. Shepley (Kenneth) appeals from the order entered on October 8, 2019, that involves the probate of the estate of James F. Shepley (Decedent), Kenneth's father, who died on December 24, 2011.  Essentially, Decedent's will provides that his entire estate is to be left to his second wife, Gertrude A. Richardson a/k/a Gertrude A. Shepley (Gertrude).  After review, we affirm.[1]

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Initially, we note that the parties to this appeal have filed an unfathomable number of motions during the course of this litigation to which this Court has entered numerous orders.  The latest concerns Gertrude's motion to strike Kenneth's brief for lack of any legal authority, and her request for counsel fees to cover her attorney's work on filing a response to Kenneth's motion.  In fact, neither Gertrude's motion nor Kenneth's response contain any citations to case law.  Rather, both parties assert that the other party has not complied

We begin by setting forth our standard of review.

Our standard of review of the findings of an Orphans' Court is deferential.

> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion.
>
> However, we are not constrained to give the same deference to any resulting legal conclusions.
>
> *In re Estate of Harrison*, 745 A.2d 676, 678-79 (Pa. Super. 2000), *appeal denied*, 563 Pa. 646, 758 A.2d 1200 (2000) (internal citations and quotation marks omitted). "The Orphans' Court decision will not be reversed unless there has been an abuse of discretion or a fundamental error in applying the correct principles of law." *In re Estate of Luongo*, 823 A.2d 942, 951 (Pa. Super. 2003), *appeal denied*, 577 Pa. 722, 847 A.2d 1287 (2003).

*In re Fiedler*, 132 A.3d 1010, 1018 (Pa. Super. 2016) (quoting *In re Estate of Whitley*, 50 A.3d 203, 206-07 (Pa. Super. 2012)).

Kenneth raises the following three issues for our review:

> A. Poisoning a testator's mind, by the proponent of a will against a natural heir, is a form of fraud in the inducement, which can invalidate a will. Witness testimony and opposing party statements showed that appellee Gertrude poisoned Decedent James F. Shepley against his sole natural heir[,] Kenneth J. Shepley…. Yet all such evidence was avoided by

_____

with appellate standards in light of the absence of case law cited by them to support their positions. After review, we deny any outstanding motions or requests for counsel fees.

the trial court. Should the court below have assessed [Kenneth's] poisoning of the mind and related evidence?

B. Even in a civil bench trial, every plaintiff has a right to argue their case based on the final evidence. The court below precluded Kenneth … from presenting a closing argument, or brief, based on the final evidence, effectively muting his case. Should the trial court have allowed Kenneth … an opportunity to present his final arguments?

C. Arguments of a party in a lawsuit are for it alone to make, not a trial court. Here, the trial court created its own arguments and analyzed them as if they were appellant's. Had these arguments actually been … [Kenneth's], there would be no harm. However, they were not even close to his true arguments. Did the court below, by assessing its own arguments instead of [Kenneth's], show prejudice?

Kenneth's brief at 4-5 (answers omitted).

We have reviewed the certified record, the briefs of the parties, the applicable law, and the thorough, 23-page opinion authored by the Honorable David J. Williamson of the Orphans' Court Division of the Court of Common Pleas of Monroe County, dated October 8, 2019.[2] We conclude that Judge Williamson's well-reasoned opinion appropriately disposes of the issues presented by Kenneth and his accompanying arguments, which are essentially attacking the findings and credibility determinations of the court. **See** **Fiedler**, **supra**. Accordingly, we adopt Judge Williamson's opinion as our own and affirm the order from which Kenneth appealed.

---

[2] On December 4, 2019, the orphans' court issued a statement pursuant to Pa.R.A.P. 1925(a), indicating that after reviewing Kenneth's concise statement filed pursuant to Pa.R.A.P. 1925(b), it "determined that the [c]ourt ha[d] adequately addressed these issues [raised by Kenneth] in its Opinion accompanying [the] Order dated October 8, 2019." **See** 1925(a) Statement. Therefore, the court declined to author an additional opinion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/19/21

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE: : NO. 32 O.C. 2012
:
    ESTATE OF :
    JAMES F. SHEPLEY :
: APPEAL FROM PROBATE

## OPINION

This matter comes before the Court on an Appeal from Probate filed by Kenneth Shepley[1] ("Petitioner"), the son of the Decedent, James F. Shepley. ("Decedent"). The Decedent died on December 24, 2011 at the age of 91. Gertrude Shepley, the spouse of the Decedent at the time of his death, has filed responsive pleadings. An Opinion and Order entered previously in this matter on March 13, 2014 denied Petitioner's Petition to Freeze Assets, Compel Accounting, Removal of Executrix and Compel Recovery of Assets. Hearings on Petitioner's Appeal from Probate were held on June 18, 2019 and August 20, 2019.

### Factual Background

James F. Shepley died testate, leaving a Last Will and Testament dated July 24, 2008, ("the Will"). This Will was admitted to probate on January 4, 2012. The Decedent left his second wife, Gertrude Shepley, and his son, Kenneth Shepley, to survive him. The Decedent's

---

[1] Kenneth Shepley was represented by counsel in the initial filing of the appeal and at hearings held November 25, 2013, January 10, 2014 and January 31, 2014. He has represented himself *pro se* thereafter.

first wife died on February 23, 2004. The Will left all of the Decedent's estate to his second wife, Gertrude, with the exception of a property and trailer thereon located in Monroe County, Pennsylvania, which was bequeathed to Kenneth Shepley. However, that property and trailer were sold by the Decedent, prior to his death, for $20,000. In the event Gertrude predeceased James, the Will left the balance of the Estate, after a $25,000 specific bequest to Kenneth Shepley, to Gertrude Shepley's two daughters.

The Will was prepared by Lori Cerato, Esquire, of Stroudsburg, Pennsylvania, at the direction of the Decedent, James F. Shepley. Mr. Shepley met with Attorney Cerato on July 17, 2008 to discuss the provisions of the Will, and he returned to Attorney Cerato's office on July 24, 2008 to execute the Will. This Will replaced a Will the Decedent executed February 12, 2005, that left his entire estate to Kenneth Shepley, and if he predeceased, then to Kenneth's wife, and if both predeceased, then to the Salvation Army. Attorney Cerato testified about this same subject five (5) years ago on Petitioner's Petition to Freeze Assets, et al. She has been practicing for twenty-five years and specializes in Elder Law, Estate Planning and Estate Administration. At the time of the meeting with Attorney Cerato, Decedent was not yet married to Gertrude. They eventually married about one month later. Attorney Cerato recalled that Decedent and Gertrude came in to see her at the first meeting to discuss a new will and power of attorney for the Decedent. Attorney Cerato had never met them before the appointment. Attorney Cerato recalled that the Decedent told her about being hit by a vehicle in June of that year, approximately one month prior to the appointment, on Main Street in Stroudsburg.

Attorney Cerato had two (2) appointments with Decedent; the first to discuss what he wanted and to assess his mental capacity, and the second to go over the documents she

2

prepared and sign them. Attorney Cerato met privately and confidentially with the Decedent to discuss his wishes. Gertrude was not present during that time, nor when Decedent signed the documents. Attorney Cerato evaluated Decedent's mental capacity at both appointments and she was confident he had the requisite capacity. Attorney Cerato spent almost two (2) hours alone with Decedent discussing his assets, his family and what he wanted. Attorney Cerato did not discuss Gertrude's assets or finances with the Decedent. Attorney Cerato concluded that the Decedent knew what he wanted to do with his assets and that his actions were voluntary.

According to testimony from all hearings in this case, the Decedent met Gertrude Shepley, formerly Gertrude Richardson, prior to the death of his first wife, through mutual friends. He began a relationship with Gertrude sometime in 2006-2007. The couple married in August 2008, at which time the Decedent moved in with Gertrude in the home she lived in located in Scotrun, Pennsylvania. The house was owned by Gertrude's daughter, but only James and Gertrude lived there. Prior to moving to Scotrun to live with Gertrude, James F. Shepley resided in the home he owned in Collingdale, Delaware County, Pennsylvania. The Decedent had lived in the Collingdale home most of his adult life. The Decedent sold the Collingdale home prior to his death for $100,000.

The relationship between Petitioner and his father, the Decedent, began to break down shortly after the Decedent began dating Gertrude. Prior to that, the Decedent was very close to Petitioner and his wife, Christina Talucci. Petitioner lived near the Decedent, would visit him often, take vacations together, and assisted him with his medical appointments and other needs. However, the relationship deteriorated to the point where Petitioner and his wife did not attend the 2008 wedding of the Decedent and Gertrude. By the time of Decedent's death,

there was little communication between him and Petitioner and Petitioner's wife. There was also little communication, other than e-mails, between Petitioner and Gertrude. Following the death of the Decedent, Gertrude did not call and let Petitioner and his wife know that the Decedent had died.

After the Decedent married Gertrude he changed the beneficiary designation on a small life insurance policy. The designation was changed to Gertrude as the beneficiary, and her daughter Brenda Bell as the contingent beneficiary. This replaced the previous designation made February 23, 2004, naming Petitioner and his wife as beneficiary and contingent beneficiary. Also, the Decedent added Gertrude as a beneficiary on two (2) bank accounts at Citizens Bank. Gertrude also received an account titled to the Decedent at Wells Fargo Bank at his death as a purported beneficiary of the account. It was not clear whether or not there was such a designation on the account, or if it passed to her as a co-owner. The total assets of the Decedent, both passing through the estate, and those passing outside of the estate, total $346,684.76.

At the hearing held June 18, 2019, Sheila Earhart, daughter of Gertrude Shepley, was called as a witness by the Petitioner. Ms. Earhart has lived in Carlisle, PA, since prior to the time Gertrude and Decedent entered their relationship. Petitioner asked Ms. Earhart various questions concerning her own financial situation and that of her mother, Gertrude. Ms. Earhart stated that she was not generally aware of her mother's finances at the time just before her relationship with the Decedent, or thereafter, as it was not her business. Ms. Earhart met the Decedent several times, noted that he had a good memory, told her stories from his life and that he had a son (Petitioner). She believed the Decedent made her mother very happy and that was

4

all that mattered to her. Ms. Earhart stated that the Decedent told her he just wanted to take care of her mother. She stated that the last thing her mother cared about was money.

Ms. Earhart testified that the Decedent volunteered to build a garage on her sister Brenda Bell's property at his cost. Decedent was living with Gertrude at Ms. Bell's property for a period of time and wanted to park his car in a garage. Ms. Earhart testified that she thought it was a nice gift and an improvement to the property. Ms. Earhart would visit Decedent and Gertrude every 4-6 weeks. She never saw the Decedent act confused. Ms. Earhart liked the Decedent very much.

Brenda Bell, daughter of Gertrude, was also called to testify by the Petitioner. She would overhear the Decedent and Gertrude talk occasionally about Decedent's friends and family in Collindale, PA. Ms. Bell would have liked to see her family and Decedent's family interact, but was unsure why they did not. Ms. Bell was also generally unaware of the details of her mother's finances. Ms. Bell looked out for her mother, but she believed her mother was fine handling her own affairs. Ms. Bell also felt her Mother's finances were none of her business at the time. Ms. Bell was unaware of Decedent's financial status, or her mother's, until after the Decedent had died.

Ms. Bell confirmed that Decedent wanted to build a garage on her property at a cost to him of $22,000. Ms. Bell and her husband tried to talk Decedent out of it, but he really wanted his car kept in a garage. Decedent and Gertrude had previously moved into Ms. Bell's home because she recently moved into her current husband's home. It was also easier for them to get around and manage in her home and it was located on a main road. Ms. Bell testified that Gertrude had decided to sell her home and had taken out a home equity line of credit on it to

make some improvements for a better re-sale value. This was done before Gertrude married the Decedent. Gertrude ultimately sold her home and the line of credit was paid off in full. Ms. Bell was aware of the lot and trailer Decedent owned in Monroe County, and that he sold it sometime after the Will was signed in 2008. Ms. Bell did not know the reason for Decedent selling the lot and trailer. Ms. Bell had hoped Decedent's feelings toward Petitioner would be resolved, but they never were and she never brought the subject up to the Decedent.

Ms. Bell testified that Decedent did what he wanted to do and that he was not isolated by Gertrude. She believes the Decedent and her mother were very happy together and knew what they were doing. Ms. Bell testified that Decedent said he had skin cancer in the past. She was also aware of the pedestrian accident on Main Street in Stroudsburg that caused Decedent's hip and leg issue. She was not aware of his lung cancer diagnosis allegedly made in 2007; only that she was aware he had lung cancer a few months before he died. Ms. Bell also liked the Decedent very much.

Don Young, Sr., a friend and neighbor to Decedent when he lived in Collingdale, PA, also testified. Mr. Young testified about conversations he had with the Decedent after he married Gertrude. This included a conversation about the trailer in Monroe County, during which the Decedent stopped discussing it when Gertrude approached them. He also testified about a similar incident on another occasion. Mr. Young said that prior to marrying Gertrude, Decedent would talk to him endlessly, but that stopped after the relationship and marriage occurred. Mr. Young was also surprised when the Decedent told him how unhappy he was with Petitioner over not attending his wedding with Gertrude. Mr. Young said the Decedent stopped socializing with him and other friends, moved away, and that his whole personality changed after

meeting Gertrude. Don Young, Jr., the son of Don Young, Sr. also testified to two (2) instances where Decedent's mood changed and their conversation cut-off by Gertrude. He felt that in both instances, Gertrude was very controlling of the Decedent's conversations.

Gertrude Shepley was called to testify by the Petitioner. She stated that she and Decedent were very happy together. They had known each other socially through mutual friends. She did not know why the Decedent stopped socializing with his friends from Collingdale. Gertrude said she did not know of Decedent's lung cancer until close in time to his death. She could not recall Decedent's prior skin cancer, or nodules found, or lymphoma or prostrate problems. Gertrude remembered that Decedent had the accident while they were crossing the street, but she could not recall if he had surgery from it or the exact details. She testified that the Decedent always did what he wanted to do. Gertrude was 90 years old at the time of the most recent hearings, and she had difficulty remembering people and events.

Attorney Leo Jackson was called to testify at the August 20, 2019 hearing. He represented the Decedent in a personal injury suit from the aforementioned pedestrian accident on June 14, 2008. At the time, the Decedent and Gertrude were crossing Main Street in Stroudsburg, PA to get to the Sherman Theater to attend a concert. As they crossed the road, a car approached and struck the Decedent. The driver of the car did not contest liability and the full policy limit of the driver was paid to Decedent. Attorney Jackson then pursued an underinsured motorist claim and recovered the full policy limit as well. The police report indicated Decedent was at fault because he was not crossing at a cross-walk. Attorney Jackson recalled that Decedent and Gertrude were following other pedestrians crossing at the same spot to go to the concert and that Decedent saw a different vehicle stop and waive them across, while

the vehicle that hit him was in a second lane of travel. He also recalled that the driver was allegedly using his cell phone at the time. Attorney Jackson had no concerns about Decedent's mental capacity or undue influence during his interactions with Decedent.

Christina Talucci, the wife of the Petitioner, also testified. She testified that prior to Decedent's relationship with Gertrude, she observed some forgetfulness and that his driving skills had deteriorated. Ms. Talucci questioned the decision of the Decedent to put off some medical appointments in order to see Gertrude and his decision not to have hip replacement surgery after the accident on Main Street in Stroudsburg. Ms. Talucci also questioned Decedent's decision to cross the street with Gertrude in the manner that he did when he was struck by the car. She also testified that Decedent and Gertrude fell on the steps outside of their residence in Monroe County at some point. Ms. Talucci did not cite any instances of mental impairment or medical conditions that effected Decedent's cognitive functions.

Ms. Talucci believed that Gertrude was not warm and friendly to her, Petitioner or Decedent's old friends. She testified that Decedent seemed to want companionship and marriage and that the relationship of Decedent with Gertrude was a business relationship Ms. Talucci was of the opinion that Decedent was pressured to marry Gertrude in order to remain companions. She stated that she and Petitioner did not attend Decedent's wedding to Gertrude because they were told by the Decedent not to come if they were only going to attend the ceremony and not the reception.

Ms. Talucci described Decedent's concern for money during the early days of his relationship with Gertrude. She also believes Gertrude told Decedent that Petitioner was just after his money. Ms. Talucci stated that Gertrude knew of Decedent's cancer diagnosis in 2007,

and told her and Petitioner not to worry, that she would help take care of the Decedent. She believes that Gertrude poisoned Decedent to his family and friends. Ms. Talucci testified that Gertrude had financial troubles and needed Decedent's help. Ms. Talucci agreed that Decedent was not the type to live with a woman unless they were married.

Petitioner also testified that Decedent seemed more concerned with finances and money after he started dating Gertrude. He believes Gertrude had a $140,000 home equity line of credit in October 2007. This was about the same time Petitioner recalled Decedent talking about selling his Collingdale home and wanting at least $140,000 for it. The property was eventually sold for $100,000 after Decedent moved in with Gertrude at Ms. Bell's property and Gertrude had sold her residence as well. Petitioner did not produce any evidence of the amount Gertrude actually borrowed from the available line of credit. Petitioner believes Gertrude isolated Decedent and he gave various examples of what he believed supported such behavior. Petitioner denies that he was the cause for the bad feelings and eventual no contact with Decedent. Petitioner believes Gertrude was fully aware of Decedent's health condition in and about 2006-2007, and was fully involved with Decedent's health care decisions thereafter. Petitioner questioned Gertrude's actual financial status and her alleged net worth.

Petitioner raised objections to the accounting during his testimony. (A first and final account of the Estate was filed January 29, 2014). He believes a $6,000 bank account of the Decedent was missing from the accounting, among a few other items. Petitioner had previously requested an accounting during Decedent's lifetime, which was denied in the March 13, 2014 order. He again raises issue with the addition of Gertrude to various bank accounts of the Decedent after they were married. Petitioner also questioned the small amounts of cash

Decedent may have given to Gertrude at about the same time she borrowed $10,000 against her line of credit.

Petitioner testified that he had concerns for the Decedent prior to the signing of the Will in 2008. He specifically noted what Decedent's friends/neighbors reported to him, the Decedent forgetting that he previously told certain stories, was sleeping a lot, was listening to a sales pitch in his home, that his driving skills declined, had turned against family and friends, and had a mean or nasty side at times. He cited Decedent's accident when crossing the road and delayed treatment for medical conditions as being reckless, and selling the Pocono property/trailer as being irrational. Petitioner believes the trailer was sold to fund the construction of the garage on Brenda Bell's property where Decedent and Gertrude were living. Petitioner cited several other incidents he believes were attempts by Gertrude to form a wedge between Decedent and the Petitioner.

Petitioner sought and was granted admission of a videotaped Deposition of Delores L. Stiff (a/k/a "Dottie Stiff") held on November 8, 2017 subject to objections. (Petitioner's Exh. 17 and 22). Counsel for Gertrude objected to the relevance of the testimony and this Court took that under advisement. Ms. Stiff testified that she and her late husband had been friends with both Decedent and his first wife, and Gertrude and a man named Albert. They would play cards together when the Decedent and his wife visited the Poconos. She testified that after the Decedent's wife died, and Albert died, Decedent and Gertrude began a relationship. Ms. Stiff stated that Decedent and Gertrude spent little time with her and her husband after that, even though Decedent and her husband had been quite close. She testified that Decedent and her late husband did not play golf again after his August 2008 marriage to Gertrude. Ms. Stiff did

recognize this was also just after the Decedent's accident and resulting surgery. She believes Decedent changed at some point from a happy-go-lucky demeanor to being somewhat depressed. The rest of Ms. Stiff's testimony was either hearsay, irrelevant, and/or based on hypotheticals.

By order dated June 19, 2019, prior hearing transcripts of November 25, 2013, January 10, 2014, and January 31, 2014 and a transcript of the deposition of June Elliott Duffy previously admitted into evidence on November 25, 2013, were all incorporated into the hearings and record on the present issues.

## Procedural Background

An Opinion and Order addressing a Petition to Freeze Assets, Compel Accounting, Removal of Executrix and to Compel Recovery of Assets was entered in this matter on March 13, 2014. The Procedural Background of that Opinion and Order is incorporated herein. The underlying Petition for Appeal from Probate sat without any movement until counsel for Gertrude Shepley filed a Petition to Dismiss Appeal. A Rule to Show Cause was issued and Petitioner filed a response thereto, as well as preliminary objections. By Order of this Court dated June 19, 2019, the Petition to Dismiss Appeal from Probate was denied and the preliminary objections thereto were dismissed as moot. Hearings were held on June 18, 2019 and August 20, 2019. The issues for hearing were allegations of lack of testamentary capacity, undue influence, and fraud in the inducement which should result in setting aside the 2008 Will. Petitioner also objects to the accounting.

11

## Discussion

The burden of proof in these matters rests with the Petitioner. The contestant (Petitioner) must present "clear and convincing evidence to meet his burden." *See* In re Estate of Fickert, 461 Pa. 653, 337 A.2d 592 (1975). The clear and convincing standard is evidence that is so clear, direct, weighty and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the matter. Id.; *See* also, LaRocca Trust, 411 Pa. 633, 192 A.2d 409 (1963). There is a presumption that a will admitted to probate is valid. Petitioner contends the 2008 Will is invalid. The Will effectively disinherits the Petitioner, as the only asset left to him, the "Pocono property," was sold by the Decedent prior to his death. All other probate and non-probate assets were left to Gertrude Shepley.

The bulk of Decedent's assets passed outside the estate as non-probate assets. This included the account balances of a Wells Fargo Bank account and two (2) Citizens Bank accounts in which Gertrude Shepley was named as a beneficiary on the accounts. There was also a small American Stock account naming Gertrude Shepley as beneficiary. The estate assets consisted of a 2011 Ford Edge vehicle and various grave plots at the Philadelphia Memorial Park. A small account of about $6,000 may have existed at Decedent's death, although it was not clear how the account was titled or distributed. Based upon the claims of Petitioner, it passed to Gertrude Shepley as a result of Decedent's death.

Petitioner has raised an issue of undue influence as to the Will. Our Opinion and Order of March 13, 2014 addressed the issue of undue influence and lack of capacity regarding Decedent's decisions, with the execution of the Will, between 2006 and the time of his death. Specifically, we previously held that there was no testimony supporting the contention that

Decedent lacked capacity or was subject to undue influence in directing the transfer of his funds, sale of his real property, the gift or disposition of his personal assets, the change in bank account designations, and change in life insurance beneficiaries. (*See* Opin. and Order dated 3/13/14 pp. 6-7). In finding as such, we denied a request to order an accounting of assets and distribution during Decedent's lifetime. We find no evidence was submitted in the two (2) more recent hearings to change that finding.

We also made a preliminary finding by Opinion and Order dated March 13, 2014 that the Will was valid. Since that time, additional discovery was conducted and additional hearings were held. We still see no evidence of undue influence, lack of capacity, or fraud in the inducement that would invalidate the 2008 Will presented for probate.

Undue influence may be proven in two ways; either directly by evidence of acts which prejudice a testator's mind or destroys his free agency, or indirectly through a shifting burden of proof. Estate of Clark, 461 Pa. 52, 334 A.2d 628 (1975). Direct proof of undue influence requires proof of the imprisonment of the mind, fraud or threats or misrepresentations or circumstances of inordinate flattery, or physical or moral coercion to such a degree as to prejudice the testator's mind. Hollinger's Estate, 351 Pa. 364, 41 A.2d 554 (1945). These circumstances must exist at the time the will is made. *See* King's Will, 369 Pa. 523, 87 A.2d 469 (1952). There is a presumption of the absence of undue influence. Taylor Will, 423 Pa. 276, 223 A.2d 708 (1966). Indirect proof of undue influence requires the following: a person is in a confidential relationship, and receives a substantial benefit, at or around the time of the will, and the testator had a weakened intellect, in which case, a presumption of undue influence arises and the burden shifts to the other party to show the absence of undue influence. Clark Estate, supra.

In this context, a weakened intellect need not rise to the level of lack of capacity; rather, it is enough to show that a mind, which under the circumstances, is inferior to normal minds in reasoning power, and it is generally exerted over a period of time. Id. Physical infirmities alone are not enough to establish a weakened intellect. Estate of Glover, 447 Pa. Super. 509 (1996).

With regard to testamentary capacity, a testator must be at least 18 years of age and of "sound mind." 20 Pa. C.S.A. Section 2501. A testator has testamentary capacity if at the time of execution of a will, he had an intelligent knowledge regarding the natural objects of his bounty, of the property he possesses, and of what he desires to do with his estate, even though his memory may be impaired by age or disease. Cohen Will, 445 Pa. 549, 284 A.2d 754 (1971). Physical weakness will not create incapacity as long as sufficient mental capacity exists. Mittleman Will, 415 Pa. 261, 203 A.2d 202 (1964). There is a presumption of testamentary capacity and the burden is on the proponent by clear and convincing evidence to show otherwise. Cohen Will, supra.

Fraud is different than undue influence. It concerns someone who is deceived by false data. See Estate of Glover, 447 Pa. Super. 1996. In the context of a will, it is a trick, artifice, or management which induces a person to dispose of property or to do some act contrary to his wishes. Markantone Will, 16 Fiduc. Rep. 2d 134 (O.C. Allegh. Cty. 1996). One must show that 1) the decedent had no knowledge of the concealed or misstated facts and 2) the decedent would not have made the bequest if he knew the truth. Estate of Paul, 407 Pa. 30, 180 A.2d 254 (1962). Finally, fraud through non-disclosure exists where a party owes the testator a duty to inform him of material facts which could reasonably be expected to affect a plan for distribution. Stirk's Estate, 232 Pa. 98, 81 A. 187 (1911).

14

KJS Brief Appendices: Page 14

Petitioner has raised numerous incidents that he contends rise to the level of undue influence, show lack of capacity and/or fraud in the inducement as to the 2008 Will. We note again that most of Decedent's assets were non-probate and passed by virtue of beneficiary and/or joint account designation with Gertrude Shepley. Those issues were previously reviewed and dismissed by this Court. We find no new evidence to disturb those findings as to non-probate assets. There simply was no proof sufficient to show that the Decedent did anything other than what he wanted to do with regard to those assets during his lifetime. The fact that Decedent and Petitioner stopped talking, or that Gertrude may have alienated Decedent's friends or convinced him to cut contact with them, or even that she may have had financial issues or the marriage was a "business relationship" as alleged by Petitioner, does not negate the presumption the Decedent did what he wanted to do with his assets. By all accounts he was happy in his relationship with Gertrude, he wanted companionship, and the marriage to Gertrude was a natural course to achieve that. It appears the Decedent chose for himself the decisions that he made during his lifetime. There was no proof that any of Decedent's decisions with regard to non-probate assets titled during his lifetime were the result of undue influence, lack or capacity, or fraud.

With regard to the validity of the Will, which is the issue remaining in Petitioner's appeal from probate, the evidence supports a finding that it is valid. Again, the fact that Decedent no longer had contact with his friends, moved to the Poconos and got married, stopped speaking with Petitioner, and changed his Will, is not sufficient proof of undue influence, lack of testamentary capacity, or fraud in the inducement. The evidence did not rise to the level of clear and convincing proof of an imprisonment of the mind by Gertrude, or fraud or threats or

misrepresentations to a degree that would prejudice Decedent's mind as required to prove undue influence. The examples cited by Petitioner and by Mr. Young, Sr. and Mr. Young, Jr. do not prove that Decedent could not make up his own mind; just that he preferred peace and happiness with his new spouse. There was no actual evidence of physical, moral, emotional or mental coercion to a degree that prejudiced the Decedent.

As reported by the neighbors who testified, on at least two (2) occasions they observed the Decedent cut-off a conversation with them when Gertrude was present. This was not sufficient to meet grounds for direct proof of undue influence. Petitioner and Petitioner's wife cited examples of how Decedent stopped talking to them and moved away from them and his friends. However, there was no proof that Decedent did anything he didn't want to do. The testimony was clear that Decedent wanted companionship, that he was the type to marry someone and not simply live with them unmarried, and that he found that with Gertrude. In fact, the testimony was that Decedent was formerly romantically interested in a woman named "Millie" prior to his relationship with Gertrude, but she was not interested in constant companionship.

As for Petitioner's relationship with Decedent, it was apparent that he and Gertrude did not get along from the start. The Decedent was also hurt by Petitioner's perceived refusal to attend the wedding. These two factors drove a wedge between Decedent and Petitioner as much as anything. Gertrude may not have promoted ongoing contact, but the testimony supported an apparent disdain the Petitioner had for her throughout the relevant time periods and was likely the primary cause of the separation from the Decedent. Petitioner was visibly upset

during the proceedings over the loss of his relationship with Decedent and it was unfortunate; however, there were insufficient facts to show it was caused by undue influence.

As for Decedent's friends, the only testimony of specific friends he stopped seeing in Collingdale were the Youngs, who were neighbors. There was a friend, Ron Stiff, who along with his wife Delores Stiff, played cards for years with Decedent and his first wife when they were staying at the Pocono property. Ron and Delores lived in the Pocono area. Ron and Decedent played golf, sometimes as many as three times per week in the summertime. That stopped after Decedent had the accident and hip surgery in July 2008. As Mrs. Stiff noted, the hip surgery likely prevented Decedent from golfing again. Mrs. Stiff also noted that Decedent saw them much less after his marriage to Gertrude. This was not direct proof of undue influence; rather just a change in Decedent's life. Furthermore, the lack of contact occurred after the marriage, which was after the Will was signed in August 2008. Therefore, the behavior as described was irrelevant to the events leading up to and state of mind at the time of the signing of the Will. In review of all of these facts, we find no direct evidence of undue influence.

Furthermore, there was no evidence of a weakened intellect of the Decedent at or around the time he executed the Will which would support a finding of indirect evidence of undue influence. In fact, Attorney Cerato, who met with Decedent alone on two (2) occasions, found the Decedent competent, aware of his bounty, that he knew what he wanted to do, and that he was doing so voluntarily. Petitioner argues that Attorney Cerato was unable to recall the specifics of Decedent's assets, and was unaware or ignored Decedent's accident and physical health, but those issues are not proof of undue influence or incapacity. Petitioner picks out small details to prop up his claims whereas Attorney Cerato relied on her two (2) hour meeting that

17

discussed things with Decedent, her 25 years practicing Elder Law and estate planning, and her experience in assessing the capacity of her clients. Attorney Cerato's testimony was convincing and credible. She noted no infirmities that affected Decedent's ability to determine his testamentary wishes. As a reputable attorney who was also the scrivener of the Will, Attorney Cerato's testimony is to be accorded great weight in favor of validity of the Will. *See* Thompson's Will, 387 Pa. 82, 126 A.2d 740 (1956).

In support of their claim for indirect proof of undue influence, Petitioner raises the issue of Decedent's accident about a month prior to signing the Will, the sale of the Pocono property, his history of cancer, and Petitioner and Petitioner's wife's observations that Decedent was "slipping" by the time he executed the new Will in 2008. With regard to the accident and the cancer diagnosis prior to July 2008, there was no medical evidence or testimony confirming a lack of judgment or impaired mental capacity of the Decedent as a result of either condition. In fact, the accident broke Decedent's hip with no evidence of a head injury. The cancer diagnosis included a history of skin cancer and some nodules were noted to exist. Only much later did Decedent die from lung cancer. The prior diagnosis and treatment did not evidence a weakened mental intellect. Petitioner also questioned Decedent's decision to initially put off some medical treatment to spend time with Gertrude. However, he eventually got the treatment and there was no evidence the delay was attributable to a weakened mental condition.

Likewise, Petitioner's concern over the Decedent's decision to have surgery at Pocono Medical Center, instead of the Philadelphia area, and to forego a hip replacement is not evidence of diminished capacity. He may have chosen Pocono Medical Center because he was

already there from the accident. He may also have decided against hip replacement because he was 87 years old at the time. Neither is proof of diminished mental capacity.

As for the decision to sell the Pocono property, the only testimony about Decedent's exact wishes at that time was from Gertrude who stated the Decedent felt Petitioner did not really care about the property. Decedent was also living permanently in a home with Gertrude and no longer needed the property for himself. Petitioner speculates the Pocono property was sold to fund construction of the garage Decedent wanted at the home he was living in with Gertrude. Even if this were the case, there was no evidence that Decedent did something other than what he wanted to do. Petitioner describes the decision as irrational because Decedent was going to leave the property to him. However, there was no further supporting evidence and Decedent could have simply changed his mind; especially if he didn't think Petitioner cared about the property.

Nor was the Petitioner's claim convincing that Decedent was "slipping" to the extent that he had a weakened mental intellect. Decedent's deterioration in driving skills is not proof that his mental capacity had decreased to the point where a designing person could take advantage of him. Re-telling stories, or even the inability to remember all prior events is not proof itself of a weakened mental intellect. Even if Decedent exhibited some nastiness toward Petitioner and his wife, it does not support a weakened mental intellect. Other than Petitioner's claimed observations of certain behaviors, there was no medical evidence of a mental impairment. Absent such evidence, Petitioner's testimony on these issues is speculation and not strong enough evidence of an impairment. Again, there was no evidence of any kind that Decedent did anything other than what he wanted to do. By all accounts from Delores Stiff and

June Duffy, the Decedent was happy about his relationship with Gertrude. It makes sense that he would seek to continue that happiness in his remaining years.

Finally, we must also note that any incidents occurring after the Will was executed in August 2008 are irrelevant to the consideration of undue influence concerning the Will. Any monies loaned or gifted after the execution of the Will, and any bank accounts changed to reflect Gertrude as a beneficiary cannot be considered on their own for purposes of any other claims by Petitioner, because the Will effectively left everything to Gertrude, and not to Petitioner. Therefore, without a showing that the Will is somehow invalid, the effect thereof eliminates any other arguments of the Petitioner regarding undue influence. (i.e. monies used to build the garage, funds given to Gertrude, changes to Decedent's bank accounts).

The Petitioner also failed to show convincing proof of lack of testamentary capacity of the Decedent. This is supported by the facts and findings set forth above. As Attorney Cerato convincingly testified, Decedent had sufficient testamentary capacity to execute the Will. Attorney Leo Jackson, who successfully represented the Decedent in a personal injury action from the June 2008 vehicle/pedestrian accident, also believed the Decedent communicated clearly with him and he had no concerns for Decedents' mental capacity or undue influence. Attorney Jackson noted that Decedent only suffered injury to his hip from the accident. There was no evidence of a head injury. Attorney Jackson also believed that the driver was fully at fault as he was talking on a cell phone at the time and did not slow down even though the vehicle in the adjoining lane had stopped to allow Decedent and others to cross the street. Attorney Jackson noted that Decedent and Gertrude were following other pedestrians who were waived

across the street by a vehicle that stopped in one lane of traffic.[2] Attorney Jackson eventually settled the case for full policy limits against the driver and the underinsured motorist policy. This testimony was convincing as to Decedent's mental capacity at or about the signing of the Will.

Finally, there was no medical testimony that Decedent lacked capacity to execute the Will. Even if it is assumed that Decedent had some memory problem or other impairment as noted by the Petitioner, it was not out of the ordinary for someone of Decedent's age. Decedent's memory and judgment may have been impaired by age or disease, but there was insufficient proof that he lacked intelligent knowledge with regard to his property and testamentary wishes. See Cohen Will, supra. Therefore, the claim for lack of testamentary capacity will be dismissed.

Petitioner next claims that Decedent was induced to execute the Will by fraud. To support this claim, Petitioner asserts that Gertrude deceived Decedent about her actual financial condition. Even if that fact were found to be true, Petitioner fails to provide any evidence of Decedent having lacked knowledge of the misstated fact, or that he relied on the misstated fact in making the Will. Furthermore, there was no convincing proof that Gertrude concealed or misstated a fact about her financial condition to the Decedent. On the one hand, Petitioner argues that Gertrude had financial liabilities of which Decedent was unaware, but subsequently argues that she had more assets than she disclosed. Neither are particularly relevant as there was no showing that Decedent relied on any misstatements of fact when

---

[2] Petitioner cited the accident, in part, as a poor decision by the Decedent. However, the testimony showed that Decedent and Gertrude were crossing with other patrons to the theater, directly in front of the theater, and at least one other vehicle stopped to let them cross. It was not the safest route, but it was not irrational or done because of lack of mental capacity.

executing the Will. It also appears from the testimony, when considered in the light most favorable to Petitioner, that Decedent was aware of some financial obligations of Gertrude. There simply was no testimony offered about conduct prior to the execution of the Will that supports a legal finding of fraud in the inducement of that Will. At all times, it appears that Decedent disposed of his property in the manner that he wanted to do so. As such, the claim for fraud in the inducement will also be dismissed.

Finally, we note that most of the testimony from the deposition of Mrs. Duffy and Mrs. Stiff support the fact that Decedent was happy with Gertrude and had decided to live the rest of his life with her. Most of the testimony in those depositions, other than the personal observations of Mrs. Duffy and Mrs. Stiff, was either hearsay, irrelevant, or both. The testimony also consisted at times of hypotheticals posed to the witnesses that were either inappropriate as fact witnesses, irrelevant, or without factual basis upon which the witness could testify. Although both depositions were admitted in full, very little weight is placed on the actual testimony.

We incorporate the prior hearing transcripts and the findings of the March 13, 2014 Opinion and Order herein. As noted previously, there was a wedge between Decedent and Petitioner and Petitioner's wife as a result of Decedent's relationship with Gertrude. Decedent also moved on from some other relationships and eventually made his life with Gertrude and her family. Whether Gertrude disliked Petitioner and Decedent's friends, or the other way around, or a combination, things were done and said that offended Decedent and Petitioner to the point where they did not speak again. It was unfortunate and inexplicable why the relationship was so strained that Gertrude did not even notify Petitioner of Decedent's death. However, it does not

22

mean that the Decedent did not know or do what he wanted when he executed the Will. As there was not clear and convincing evidence of undue influence, lack of testamentary capacity and fraud in the inducement, Petitioner's claims will be dismissed. The objections to account by the Petitioner will be also be dismissed as moot since he is not a beneficiary of any estate assets.